Mr. Justice Walker delivered the opinion of the Court. In the investigation of the numerous questions which arise in this complicated case, we find it most convenient to dispose of them in the order in which they are presented on the record, referring to the facts as they stand in connexion with ¿he particular points raised. De Baun, a resident of the county of Pulaski, was, in the year 1840, the owner of a large amount of real estate, situate in said county, and was indebted to numerous creditors, who then, and subsequent to that time, obtained judgments against him, or secured the payment of their debts by mortgages and deeds of trust, thereby creating liens on his real estate, according to date of record. Prior in date was the judgment of Gray & Bouton, rendered the 23d March, 1840; that of Lewis Beach next, rendered the 27th March, 1840; and next in order was the mortgage of Whiting & Slark, (the complainants.) filed the 13th February, 1841! As the first and most important question grows out of the contest between Whiting & Slark and Beebe, for the property embraced in the mortgage, and upon which there existed prior judgment liens in the above cases, it is not important at this time to enumerate the other claims. They will be referred to as they incidentally arise. Whiting & Slark claim under their mortgage, and as purchasers under senior judgment liens of Gray & Bou-ton and Beach, at the May term, 1843. Beebe, on the other hand, contends that the sales at the May term were void, and that he, at the November term, 1843, acquired a valid title by purchase under these, and other liens, senior in right to the claim under the mortgage. Our first inquiry is, did Whiting & Slark acquire such title under their purchase at May term, 1843? Writs of fieri facias issued on the Gray & Bouton and Beach judgments, on the 19th of February, 1841, which were levied on real estate and returned without sale: subsequently writs of ven-ditioni exponas issued with clauses offi.fa., which were levied on the mortgaged property. These writs were also returned without sale; and in the case of Gray & Bouton a writ of ven. ex. issued, directing the sale of the property first levied upon alone. In the case of Beach, a writ of ven. ex., directing a sale of the property first levied upon, with a clause of Ji. fa., which was levied on the mortgaged property. Under these writs, Whiting & Slark purchased and claim title. To the validity of this title, it is objected, first: That the original ji. fa. issued in favor of Gray & Bouton was void, because it was not signed by the Clerk. The writ was valid, endorsed and perfect in every other respect. We have repeatedly held original writs void for this and like defects. The question comes up for the first time as to the effect of like omissions in judicial process, with regard to which there is said to be a marked difference. The first is connected with the inception of the suit. It is that by which the defendant is brought into court. It is the ministerial act of the Clerk, before the Court has gained jurisdiction of the party or the case. The latter is-an act after the Court has acquired full j urisdiction of the whole case and the parties, who are presumed to be present and privy to what transpires. In the latter class of cases, such defects as this-have almost invariably been amended. Campbell v. Styles, 9 Mass. Rep. 218 Young v. Hesmer, 11 id. 90. Brummell v. Rush, 10 id. 222. 2 Brock. 14. In the case of The People v. Sherborn, 5 Wend. 103, where a wrong seal had been affixed to a writ of certiorari, an amendment was permitted by affixing the proper seal. So where a writ of scire facias had no seal one was affixed. Chamberlain v. Skinner, 4 Cow. Rep. 550. And where a fieri facias issued without a seal, it was amended by affixing the proper seal. 3 Green. 29, Sanger v. Baker. And this even after levy and sale of property. 1 Iredell 34. And in a very late case, Brewer v. Sibley, 13 Met. 176, Dewey, Judge, held that, although a seal was one of the requisites of a proper writ, yet the want of it furnished no cause for a motion in arrest of judgment, and said, “It is a mere defect in form which if relied upon, must be taken in due season, and if not thus taken, the exception is waived.” And the teste of writs, whether original or judicial, have almost invariably been held amendable. Bronson v. Alpin, 1 Cow. 203. Ross v. Luther, 4 Cow. 158. Barber v. Smith, 4 Yeates 185. United States v. Camp, 5 How. (Miss.) 516. Shumaker v. Knorr, 1 Dallas 197. And in the case of Nash v. Brophy & Truler, 13 Met. 478, Shaw, Chief Justice, said, “The allowance of the amendment of the writ,- so as to make it bear teste of Daniel Wells instead of John M. Williams as Chief Justice, was right and fully authorized by the Revised Statutes.” “The teste is a mere matter of form.” Ripley v. Warren, 2 Pick. 592. It is worthy of remark in these latter cases, that the constitution of Massachusetts requires that writs shall bear teste in the name of the Chief Justice. And in the case of Davis v. Wood, 7 Misso. Rep. 164, where their constitution, like ours, required that “all writs and other process should ran in the name of the State, bear teste and be signed by the clerk of the court from whence it issues,” the question was whether an execution, which did not run in the name of the State, could be read in evidence. ;The court in that case’ said, “It may well be questioned whether that clause which directs that all writs and other process shall run in the name of the State, as it also requires all writs to be tested by the clerk, is not applicable alone to writs issued from the higher courts and courts having a clerk. But however this may be, the statute concerning writs directs that those emanating from justices’ courts, shall ran in the name of the State. In our government, jurisdiction is conferred by the constitution on the superior and inferior courts, and writs are only part of the machinery employed by the courts for the exercise of the jurisdiction with which they are invested. It is not perceived how a writ wanting a constitutional requisite is more defective than a writ wanting a statutory one. The constitution, as well as the statute, is merely directory, and neither the one nor the other expressly makes void a writ not in conformity to its provisions.” And in a case like the one under consideration, where the writ only lacked the signature of the clerk to make it perfect and formal, it was held by the Supreme Court of Indiana amendable. Woolbright v. Wise, 4 Blackf. 137. These various instances of amendment will suffice to show the opinions entertained by most of the American Courts. We are fully aware of the close connection in principle between this case and some of our former decisions upon the question involved. And whether, if this court was now for the first time called upon to construe the constitution and the statute prescribing the requisites of a writ, and to decide how far and under what circumstances writs would be declared void or amendable, it would adopt a more liberal rule of construction than that heretofore established, we are not called upon in this case to declare. But in the case before us, where judicial process is the subject of consideration, in view of the enlarged powers of courts in amending such process (and no statute confers more ample authority for that purpose than ours does) we are of opinion that although a writ without a signature of the clerk, as required by the constitution, is erroneous, yet it is not necessarily void, and the court from whence it issued, upon application for that purpose, might either quash or amend it as the circumstances of the case might require. There can be no doubt but that some of the former decisions of this court were made under an erroneous impression with regard to the effect which tile constitution had upon the validity of the process, that as the constitution required the signing, &c., it could not be dispensed with, and being a constitutional defect is void. Now, upon a moment’s reflection, it will at once be perceived that a directory Enactment of the constitution is of no more validity as a law than a like enactment by statute. Both are laws, though emanating from different law making powers. The only difference between the two is that the legislature cannot pass a law dispensing with the requisites prescribed by the constitution, whilst it could repeal that made by its own body. In other respects, they are equal. Instead therefore of looking to these, the true inquiry is, is the writ so totally defective as not to perform the offices of a writ, and what will be the effect of the amendment upon the rights of the parties ? The writ in this case being amendable, when collaterally questioned, as this is, will be considered as amended. Stevens v. White, 2 Wash. Rep. 203. . The next question presented for consideration is, as to the effect of an undischarged, subsisting levy on land. It is contended on the one side that a subsisting undischarged levy, whether upon goods or land, is a satisfaction of the judgment until discharged according, to law and found insufficient. On the other side, it is said that such is not the effect of a levy, or if such should be its effect when made on personal property, that the rule does not apply to a levy on land. There are but two writs given the creditor by the common law for enforcing, satisfaction of his judgment; that offi. fa., by which he levied on the goods of the debtor^ and levare facias, by which-he not only took the goods, but also the issues and profits of the land.- By statute, he was allowed also the writ of ca. sa. against the body of the debtor,, and the writ of Elegit against his lands: {Plow. 441;) and the levy on goods. (Clerk v. Withers, 2 Ld. Raym. 1072;) the arrest of the body of the debtor, (Foster v. Jackson, Hob. 124;) and the delivery .of a moiety of the land. (Bri. Err. 257,) were each held an unqualified satisfaction of the judgment. And the rule as laid down in the case of Clerk v. Withers, was recognized by most of the American courts for a long while. Thus in New York, Kent, Chief Justice, in the case of Denton v. Livingston, as early as 1812, recognized and approved the decision in that case, after which for 27 years, in a series of uniform decisions, it was adhered to, until, in the case of Green v. Burk, 23 Wend. 490, Cowan, J., for the first time in that State, questioned the propriety of the rule in its unqualified sense, after which Bkonson, C. J., in the case of The People v. Hopson, 1 Denio, distinctly announced a change in the rule, which has since been generally acquiesced in by most, ,indeed all of the courts of the • United States, so far as we are advised. In that case, he said, “If the broad ground has not yet been taken, it is time it should be, asserted, that a mere levy on sufficient personal property, without any thing more, never amounts to a satisfaction of the judgment. So long as the properly remains in legal custody, the other remedies of the creditor will be suspended. He cannot have a new execution against the person or property of the debtor, nor maintain an action on the judgment, nor use it for the purpose of becoming a redeeming creditor.” It would be a useless consumption of time to refer at length to the numerous decisions which substantially affirm this decision. Kershaw v. Merchant's Bank New York, 7 How. (Miss.) Rep. 386. Walker v. Mc Donald, 4 S. & M. (Miss.) R. 133. Laslie v. Moore, 1 Blackf. 226. McIntosh et al. v. Chew et al., id. 286. Murry v. Ashton, 7 Blackf. 289. May v. Hollingsworth, id. 350. Merchants Bank v. Kempley, 2 Doug. R. 279. Reynolds et al. v. Executors of Rogers et al., 5 Ohio 174. Miller v. Estel, 8 Yerg. 450. Hopkins v. Chambers, 7 Mon. 260, are all cases in point. So that we may say, so far as a levy on personal property is concerned, that the question is settled. Indeed the counsel seem to have virtually conceded the rule to this extent, but argue strenuously that it does not'apply to a levy on land. Because, they say, the reason upon which the rule rests in regard to levies on goods, does not apply to levies on land. Is this true? The officer acts under the same authority. The property whether lands or goods is alike liable to be levied on; every act necessary to constitute a valid levy in the one instance is also necessary in the other. In either, the officer in making his levy identifies, sets apart and estimates the value of the property taken. When this is done, the levy is complete. It is not necessary to the validity of the levy that the 'sheriff should take actual possession of the goods. Ray v. Herbert, 19 Wend. 495. It is all sufficient, if he has the*goods within his power at the time. The officer by virtue of his levy, acquires a special interest in the goods arising out of his obligation to protect them and hold them subject to sale. This interest is common to bailees, yet they have no title for any other purpose than that of protection. The property is in the custody of the law. The sheriff is its officer. The title is not changed but remains in the debtor until it is sold, just as the title to land does. Can it be said then that, because the officer exercises this right, which itisunnecessary for him to exercise, when the levy is on land, the whole legal effect of the levy is changed. The old rule was not based on a change of possession but of title. The modified rule abandoned the reason and the rule together, and left them on the same footing. Thus in the same opinion, in which the rule is changed, the court denies to a levy the effect before then given to it. It is there said, “the mere levy neither gives any thing to the creditor nor takes any thing from the debtor. It does not divest a title. It only creates alien on the^property.” The old rule that a levy was an absolute satisfaction, was established by this process of reasoning. That a levy divested the owner of the possession of his goods, and that possession under the levy was in law a change of title to the property, and as the debtor had lost his title to the property, that the debt was satisfied. The modern decisions, we have seen, hold that a levy and possession under it produce no such effect, and are not an absolute but a prima facie satisfaction. Possession then was only relied upon under the old rule in connexion with the levy as effecting a change of title. Beyond that, it was a mere matter of convenience or inconvenience to the holder, for the law, as now settled, is that a “levy neither gives any thing to the creditor nor takes any thing from the debtor.” It does not divest a title but merely confers a right to sell; and this light to sell is alike conferred in all cases whether made on goods or land; and as lands and goods are placed on an equal footing as to the effect of the levy, they must be equally so as a satisfaction; and to concede the rule of prima facie satisfaction in regard to goods, is, in principle, to concede it also in regard to lands, for a*! the possession does not confer any quality upon the levy which makes it a change of title to the property and thereby a satisfaction, possession ceases to be more than a mere question of convenience with the debtor, with which the creditor has nothing to do. So, under the English and American practice, where lands were taken by digit or levare facias, as in the case of Ladd v. Blunt, they were held to be a complete and unqualified satisfaction, and upon the same grounds which a levy on goods was so held, the change of title to the property. And this was the case with regard to a levy on lands by fi. fa. until the case of Shepperd v. Rowe, 14 Wend., where for the first time the distinction was made between the effect of a levy on land and goods. That case is entitled to particular attention as the earliest and leading case for the distinction contended for. Let it be borne in mind that up to that date and in that case and long after, the courts of New York held a levy on goods an absolute satisfaction and extin-guishment of the judgment. And in that case admitted such to be the effect of a levy on goods. They denied, however, that a levy on lands went to that extent. The court in that case said, “by the levy on goods, the debtor is deprived of his property; it is not so in the case of a levy on real estate, the debtor notwithstanding the levy holds the title and the possession, and is in the enjoyment of the profits of the land.” And again the court says, “The defendant is not without a remedy, for the court on application would stay the suit on the judgment until the sale and return of the execution. We cannot allow, however, a seizure and levy of execution on land to be per se an extinguishment of the j udgment.” Thus, it is distinctly announced that the Court would have stayed the proceeding on the judgment until the sale and return of execution, but would not allow it the effect to extinguish the judgment, as they would had it been a levy on goods instead of land, but they gave it all the effect which was allowed to a levy on goods according to the rule as subsequently settled in the case of Green v. Burk, and The People v. Hopson. It materially weakens the force of the decisions after this case, which deny that a levy on land is even prima facie a satisfaction of the judgment, when it is seen that in almost every instance they quote this case as authority for their decisions, and assign as a reason for the distinction the temporary possession of the property by the ofii-» cer, between the levy and the sale, the mere exercise of a right resulting from the levy. An attempt is made in argument to weaken the force of a levy on land because the j udgment lien existed at the time it was made. It is true that there is a general lien thereby created on all lands of the debtor, and it is equally true that, from the delivery of the writ, there is a general lien on all the goods of the debtor: these general liens must in either case necessarily exist at the time the levy is made. But the necessity of the levy is just as great in the one case as in the other. In order to effect a sale of either, it is necessary to select, identify and set apart the particular property taken in satisfaction of the judgment. The creditor is not permitted to take all the property, because it is all bound for his debt, but in the language of his writ, “sufficient to satisfy the debt,” and it is, we apprehend, this setting apart and taking in satisfaction which constitute it a satisfaction. The claims or demands of the law on the debtor are then satisfied. To illustrate this point: Suppose A. should covenant with B. that out of his whole estate of land and negroes, B. should select and set apart enough to satisfy his demand of $1,000, to be sold at the expiration of thirty days, unless before that time A. should pay the $1,000, A. reserving to himself the right to say whether land or negroes should be set apart, and also what particular slaves or tracts of land should be taken, provided it should be sufficient in value to satisfy the debt. Upon this covenant, B., in the first instance, would hold a general lien or right to select out of the whole estate of A. This the covenant gives; it is no satisfaction; but when A., in the exercise of his reserved right, points out the property to be set apart and taken, B. is bound to take that alone if of sufficient value, and when taken, the covenant is satisfied, and he cannot come back on A. for other property until it is ascertained by sale that that given up is not sufficient. Nor does it at all change the result that land is given up which B. could not take into actual possession or slaves which he could. Should B. after this, return and take other property of A. before disposing of the first, he would certainly be a trespasser, and if so in the case stated, why not in the case of a levy ? The execution was in the first instance a lien on the whole estate of the debtor; the law gave to the creditor a right to have out of his whole estate, whether of land or goods, sufficient taken and set apart to satisfy his debt and constitutes the officer his agent to do this, but at the same time gives to the debtor the right to say which particular piece of property shall be taken, whether real or personal, and if of sufficient value denies to the officer the right to take any other. Can it be less a satisfaction of the demands of the law because it is land which cannot be removed into possession of the officer ? If the creditor may abandon this land, after he has accepted it as satisfaction, and come upon the debtor’s property again, is it not evident that he could in the first instance have refused to accept it as satisfaction, for then he had not ac . cepted, yet the law says he shall take it if of sufficient value, and that alone. We must believe it a violation of law and the rights of the debtor to return upon him for a further satisfaction until the first is found to be insufficient, in due course of law, and if this right to abandon a levy and return upon the debtor be conceded in one instance, where is it to stop? Upon the same grounds, the creditor might return upon the debtor until his whole estate would be either encumbered or withdrawn from him. The statute has expressly provided against this, and this course of reasoning would result in its virtual repeal'. We have been referred to an array of decisions which, it is said, uphold the distinction between the effect of a levy on goods and land. Upon reviewing them, it is found that 14 Wend., 4 Hill, 5 Ohio, 10 S. & M. (Miss.), 4 Mass., 9 Serg. & Rawle 16, are the only cases in which the question of a levy on lands was presented. The other cases turn upon other points. Thus, in 2 Ark. Rep., the question was whether a levy on the goods of one defendant which were subsequently re-delivered to him without sale, could be pleaded in satisfaction of the judgment by a co-defendant. 5 Gill & John, was not a case of levy on land; so far as may be learned from the record, nothing whatever is said about land, or the effect of a levy upon it. 23 Wend, was a case of a supposed levy on personal property, it turned out, however, that there was no valid levy made. The case of Miller v. Estill, 8 Ycrger 460, since decided in Tennessee, holds a different doctrine from that contended for by counsel in 5 Yerger; 2 Dev. was a case of a levy on a lot and slaves; 2 Douglass was a case of a levy on goods; 9 Serg. & Rawle was a case under the Pennsylvania statute where recognizance was entered into which operated as a stay on the judgment. After the stay had expired, execution issued and was levied on land, and returned without sale, suit was brought on the recognizance; the court held that the creditor has his election to proceed on the judgment or the recognizance, and if on the latter the levy was no satisfaction and could not be so plead, and also that such would have been the effect as between the parties to the original judgment. The same court, in the case of The Bank of Pennsylvania v. Lalshaw, 9 Serg. & Rawle 9, held that a levy on land could not be abandoned whilst in force, so as to permit a ca. sa. and arrest of the person of the defendant. It is true that importance is given to the statute in regard to issuing writs of ca. sa., yet in spirit that statute is not more stringent than ours, which denies any other satisfaction than the property selected by the debtor, if of esteemed sufficient value. So that, taken all together, the decision in this case is of doubtful authority. The case of Shepperd v. Rowe, 14 Wend., has already been examined. It went no further when fairly considered than to place a levy on land just where the subsequent decisions placed a levy on goods. The case in 4 Hill was decided upon the authority of this case alone, and doubtless without a close examination of it. The case in 5 Ohio, clearly makes the distinction contended for, but is placed distinctly upon the ground of a change of possession of the goods in the one instance and not in the other, and quotes as authority the English authorities, the early New York authorities and the case of Ladd. v. Blunt, 4 Mass., all of which cases upheld and sustained the doctrine of absolute satisfaction, and were made before the rule had been modified as it was in the case of Green v. Burk, 23 Wend., and all the after decisions. This change of possession in all these cases was closely associated with an idea of change of property, indeed supposed to have that effect. So far as the case of Ladd v. Blunt, could be held as authority in regard to a levy on land, it will be seen that that case was governed by a statutory proceeding in the nature of Elegit, the writ of Extendi Facias by which the property was delivered up to the creditor without sale; but even that too was considered and upheld on the ground of change of property. 10 S. & M. (Miss.) Rep., is a case fully in point. It was made without reference to authority,’ and fully sustains the position assumed by counsel. After reviewing these authorities then, we find the Courts of New York, upon the credit of Shepherd v. Rowe, 14 Wend.; of Ohio, upon the authorities of the old cases which rested the rule upon a supposed change of property effected by a levy; the Mississippi and perhaps the Maryland courts may be said to sus-* tain the distinction between the effect, of a levy on goods and land. And opposed to these decisions, are the courts of Kentucky and Indiana, Michigan and Tennessee, as will be found by reference to the cases of Hopkins v. Chambers, 7 Mon. R. 262. Lessell v. Moore, 1 Blackf. R. 226. McIntosh et al. v. Chew et al., id. 289. Miller v. Ashton, 7 Blackf. 30. Marcy v. Hollingsworth, id. 350. Safford v. Beach, 2 Day 153. Miller v. Estill, 8 Yerger 460. Thus, in the case of Hopkins v. Chambers, it is said, “The first execution on the bond was levied upon a tract of land which does not appear ever to have been sold or released from the execution, and of course no other execution could regularly thereafter issue to take other estate of the defendant, whilst the land seized under the first remained undisposed of and subject to that execution.” In Lessell v. Moore it was held “that where real estate of the defendant was held by a ven. ex., the plaintiff could not take out an execution offi./a. and levy on other property, and if done the Court would set it aside as illegal.” In McIntosh v. Chew it is held “that a levy on goods or land is a satisfaction of the judgment, and may be pleaded in bar of any other action until the insufficiency of the levy appear by sale and return.” And so in Miller v. Ashton; and in Marcy v. Hollinsworth, it was held “that after fi. /a. levied on land and before the levy is disposed of, if a second fi. /a. issue, it is irregular and void.” In the case of Sqfford v. Beach, although the court denies to the levy the same effect as if made on goods, yet it still treats a second levy as an irregularity, for which even a sale under it might have been set aside upon motion for that purpose in due time, but that a motion after five years was too late. In Miller v. E still, the Court deny to the levy on land the same effect as if made on goods, but hold it to be the inception to a right of satisfaction. From this hasty review of these decisions, it will be seen that the courts of Kentucky and Indiana, in full and unqualified terms, sustain the former decisions of this Court in Anderson v. Fowler, and Anthony v. Humphries, whilst the later cases in Michigan and Tennessee in qualified terms, but in each case the qualification grows out of an effort to discriminate between absolute and qualified satisfaction, which they concede to be the effect of a levy on goods but deny to a levy on lands the same effect; just as in the case of Shepherd v. Rowe. Upon á review, therefore, of all the authorities on both sides, to which we have had access, it is evident that, if resting upon the number of decisions by the several State courts the preponderance might be in favor of the distinction, the strength of the argument and reason for a different conclusion is however against the distinction; but even if otherwise, unless clearly so, we would not feel at liberty to change the rule as laid down in Anderson v. Fowler, and we are far less inclined to do so, when we come to consider the effect which a different rule would have upon the rights of the debtor secured to him by statute, as well as the inroad which it would make upon a general principle which seems to pervade our whole system, that the creditor is entitled to but one satisfaction, and that when he elects which he will take, he shall be bound by such election. Our statute gives to the debtor the privilege of selecting the property to be surrendered in satisfaction, and if of sufficient value it denies to the creditor the right to take any other. This may be and often is an important privilege to the debtor, a shield thrown ^around him to protect him from oppression and wrong, and at the same time does no injustice whatever to the creditor. for it is of no consequence to him what particular property is taken, so that it is of value sufficient to pay his debt. Lands and personal property are alike liable to be taken. The debtor has a right to give up either, and when selected and accepted they alike satisfy the demand of the law, and there is no way by which to preserve unimpaired the provision of the statute, without so considering them. Rid this question of satisfaction of the misti-fication which is thrown around it by atttempting to connect with it reasons and considerations which were alone applicable to the rule of absolute satisfaction, and it amounts to this, that as the law recognizes but on satisfaction, when the creditor comes upon his debtor for the amount of his debt in money, or property, sufficient, when sold, to bring the money, and takes at his discretion in value property sufficient for that purpose, the property in effect stands until it is sold and the money made, in the place and stead of that much money, and must be presumed to be enough — the creditor has accepted it as such — and it has fully satisfied the demands of the creditor upon the debtor (until upon sale it otherwise appears) as payment would, and where this property is in the mean time, whether in the hands of the officer or immoveable as lands are, has nothing whatever to do with satisfaction; if lands, it is if any thing the more satisfaction, because not subject to waste or total destruction as goods are, and as to this matter of inconvenience in taking from the debtor his property and special property in the officer and change of title, however they might have served as reasons for the old rule of satisfaction in the absence of statute such as ours, yet surely when we consider that the debtor has his election to give up whatever property he chooses and does so, being his own voluntary act whether the one or the other, is matter of choice and convenience to himi Thus considered, the rule for which we contend harmonizes with a train of decisions upon other branches of the same subject. The law gives to the creditor the right to select which of the several means of enforcing satisfaction he will avail himself of but when he has made such selection, will never permit him to abandon it capricously. He may prefer to take his debtor into custody on ca. sa., and whilst so held all other satisfaction is denied him. But if the debtor should escape, the creditor may resort to other process for his satisfaction. Taylor v. Thompson, 5 Peters 358. So the creditor may elect to take goods by fi.fa. in satisfaction, and when he has done so, the satisfaction is precisely the same in principle as if he had taken the body of the defendant in custody, whilst he holds them in execution the law gives him no other indemnity. But should they by acts not the fault of the creditor be lost to the debtor or appropriated according to law, and found insufficient, then on the same principle that the escape of the debtor from prison entitles the creditor to further process, he he may sue out an alias fi. fa., yet like a voluntary discharge of the debtor from custody, if the goods are appropriated or wasted by the acts of the creditor, or his accredited agent, the satisfaction would become complete, at least to the amount of the value of the goods so wasted. People v. Hopson, 1 Denio 578. So, also, where a levy is made and a delivery bond (which by statute has the force of a judgment when forfeited) is taken and forfeited, the levy is discharged and the bond so forfeited held to be a satisfaction of the former judgment. Taylor v. Dundass, 1 Wash. 94. Cook v. Pills, 2 Munf. 153. Lusky v. Ramsey, 3 Munf. 433. United States v. Graves, 2 Brock. 385. Joyce v. Ferguar, 1 A. K. Mar. 20. Justices of Mason County v. Lee, id. 248. Chitty v. Glenn, 3 Mon. 425. Young v. Reed, 3 Yerger 298. Davis v. Dickinson. 1 How. (Miss.) Rep. 68. McNutt et al. v. Wilcox & Fearn, 3 How. (Miss.) Rep. 419. Sanders v. McDowell's ad'm., 1 How. (Miss.) Rep. 9. Minor v. Lancashire, 4 How. Miss. 350. Wanger v. Baker, id. 369. United States v. Patton, 5 How. Miss. R. 280. Barker v. Planter's Bank, 5 How. Miss. Rep. 566. Field v. Moss & Harrod, 1 S. & M. Rep. 349. Barns Ex. v. Stanton et al., 2 S. & M. Rep. 461. Clark v. Anderson, 2 How. 852. Stewart v. Fergua, Walk. R. 175. Connell v. Lewis, id. 251. Annis v. Smith, 16 Peters Rep. 304. 4 How. U. S. S. C. Rep. 12. Yet should the bond be quashed, the effect thereof would be to revive the former judgment just as setting aside the first judgment would revive tbe original cause of action which had been merged in it, and which remained so, so long as the judgment was in force. And so effectual is this satisfaction that after a delivery bond has been taken and forfeited, it has been held that a second execution, levy and bond on the original judgment are void. Witherspoon v. Spring, 3 How. 60. In McNutt v. Wilcox & Fame, 3 How. 419, the court said, “The forfeiture of a forthcoming bond extinguishes or satisfies, as it is said, the original judgment,because it is a proceeding arising on it and has in itself the force and effect, and is of equal dignity with a judgment, and a plaintiff is not entitled to two subsisting judgments on the same cause of action against the same individuals. It is like a second judgment obtained by an action on the first; the plaintiff cannot proceed to enforce the first, but must rely upon the second.” Chief Justice Shahkey has here assigned the reason which extends not alone to judgments but to contracts and the process, to final payment, which upon one cause of action looks to one satisfaction, and in each step closes up the avenues to retroaction to final payment. Thus the account is merged in the bond, the bond in the judgment, the judgment in the further judgment, the levy, prima facie, satisfied the judgment ; and the payment which is the end of the law discharges them all. These various references however are not to be held as settling the rule in either of them, but to illustrate a general principle. And in precise analogy to this, do we find the same principles pervading our beautiful system of pleading, the prominent features of which are progressiveness, singleness of issue by confession and avoidance, by which, there is secured to the defendant the full benefit of his defence, and yet compels him to abandon his former ground before he shall rely upon another. The law truly “ makes no step backward.” So satisfaction is a de-fence — a plea in bar of a recovery. The law gives but one satisfaction, and when the party takes it, he must abide by it if sufficient. It must, however, be sufficient; if partial, it is not a good bar, and as the debtor could not plead it in bar, so the creditor is not bound by it. The law presumes the debtor able to pay his.,debts, and commands the officer to take property of sufficient value to make him a full satisfaction. We must presume that he has done this; and therefore, until the levy is legally discharged, it must be considered and held as such. The creditor, until it is shown to be otherwise, can make no step backwards. Such being our views of the effect of the first levy, it necessarily follows that the writs of ven. ex. with Ji. fa. clauses were improperly issued; a simple ven. ex., directing the sale of the property, which, by the return of the sheriff upon the original fi. fas. appeared to be in his hands unsold, was the appropriate writ. We are not of opinion, however, that these writs were absolutely void, or that a sale made of property levied upon under the fi. fa. clause of the writ, whilst the first levy remained in force, should in all cases be set aside. Had there been an actual payment and satisfaction of the judgment, there would have been much reason for holding the subsequent writs and sale void, this would have been at least equivalent to a perpetual supersedeas or injunction. Such was not the nature of the satisfaction in this case: it was dependent upon a contingency which might or might not happen. The decision of this Court in the case of Dixon v. Watkins et al., 4 Eng. 139, is in principle the same as the one under present consideration. There, an appeal was prayed, and recognizance entered into, the legal effect of which was to stay all further proceedings on the judgment, after which, and before the final determination of the case in the appellate court, the appellee sued out a writ of retorno habendo. The question presented under this state of facts was whether a writ thus issued was void or voidable, and this involved the further inquiry as to whether the judgment was annulled by the grant of appeal and recognizance or merely stayed. It was held (and we thing correctly,) that the judgment was stayed, that a legal prohibition rested on the Circuit Court from executing the judgment appealed from, until by the action of the Supreme Court it should be removed by an affirmance or perpetuated by a reversal, and consequently, that process issued whilst this prohibition existed was erroneous and voidable but not absolutely void, as it would have been had the judgment been annulled or reversed. So, in the case before us, the levy upon sufficient property to satisfy the judgment, imposes a legal prohibition upon the creditor to forego all further process of satisfaction until upon appropriation of the property levied, it is found to be insufficient in value to satisfy the judgment. The cases are strictly analogous in principle, and the rule laid down in Dixon v. Watkins decisive of this point. The writs of ven. ex. with ji-ja. clauses, though not absolutely void, were issued whilst a legal prohibition rested on the creditor from pursuing his remedy upon the judgments, and they will be held voidable, and should, on proper application for that purpose, have been set asidel This was not done, however, and we are brought, in the next-place, to consider the effect of these errors upon the titles set up by virtue of the sheriff’s sale under them. And, first, of the title of Whiting & Slark, who have filed their bill for a specific execution of their contract of purchase at sheriff’s sale. They say, that through their attorney and agent, they bought the property in dispute, being the highest and last bidders for the same; that it was knocked off to them as such, and so entered by the sheriff in his book of sales kept for that purpose, and so also returned by the sheriff on his executions; that the purchase money was in good faith paid, but that the sheriff, subsequently, upon an order of the Chancery Court (which they allege to be void,) setting aside the sales, refused to make to them a deed; that the sheriff still retains the money so paid. Bills for specific performance are addrassed to the sound discretion of the Chancellor, to be exercised of course under general well recognized principles, and will be granted or refused according to the circumstances of the case presented, when tested by such principles. The first and most important of which is that the contract shall be so certain and definite that it may be clearly understood, capable of being executed, and just and fair in all its parts. And it is said upon high authority (Story Com. Eq. 53) that “ Courts of Equity will not interfere to decree a specific performance except in cases where it would be strictly equitable to make such decree.” It is not a matter of right then, but of discretion; and it is said by the same author that it requires a much less strength of case “to resist a bill to perform than to enforce a specific performance.” This rul e harmonizes with another, which is, that the court will not, in many instances, disturb a right acquired, even though it would not have lent its aid for the purpose of enabling the party to acquire it; because at the very point where fraud, illegality and wrong enters, it may cease to be just and fair in all its parts, and for that reason the Chancellor will stop and refuse to lend his aid in the consummation of that which, perhaps, he would not lend his aid to set aside. It is upon this principle that when a purchaser, who has acquired title, and seeks to protect himself against the effect of illegal or fraudulent acts connected with his title, must not only deny all notice at the time of making his contract, but also that he had no such notice at the time.he paid the purchase money and accepted the deed, for if he should discover the fraud or illegality before his contract is fully consummated, it becomes his duty to desist at once from all further ratification of the contract, for if he presists in doing so, he becomes a particeps criminis in the fraud or wrong, and his plea of innocence and want of knowledge a falsehood. Turning to the facts of the case on this point, and testing the equitable rights of Whiting & Slark to specific performance, by the rules to which we have adverted, can it be said that they are innocent purchasers, without notice of the legal prohibition which rested on the execution of the process under which they purchased? It is very clear that they cannot, for they not only aver the facts in their bill and make it a ground of equity, but exhibit the writs as part of the bill, and evidence to sustain such allegation! It is moreover shown that their agent, who purchased for them, was well advised of the whole proceeding. They, however, attempt to evade the force of this rule of notice, by setting up the necessity of the act on their part, that they were forced to buy in protection of their rights. It seems, however, from the evidence, that the sale was made in the order dictated by themselves, and at the remonstrance of other parties; nor were they, as they allege, compelled to act for fear of the consequences arising- out of the purchase at this sale under the senior liens, for the irregularity of the sale was well known to them, and they are required to take notice of the legal consequences which would flow from such irregularity, and could, by communicating their knowledge to others, have prevented a salé, which could have defeated their junior lien. Whilst therefore innocent purchasers who buy in good faith without notice, are favorites of Courts of Chancery, and are by them covered with a broad mantle of protection founded in public policy, which is designed to give assurance to purchasers at judicial sales as well as to do justice to the innocent purchaser, yet, this is upon the supposition that in good faith they are such, for at the instant that knowledge is brought home to them, should they still persist in purchasing, public policy not only does not require that they should be protected, but, on the contrary, that their effort at fraud, oppression, or wrong should be rebuked. Under all the circumstances of the case, the complainants, in the further examination of the case, will be held as purchasers with notice, and thereby connected with the other actors, participants in enforcing the execution of a judgment known to rest under legal prohibition. There are other grounds of objection to the validity of the sale under those writs, which we will next proceed to notice. The writ in the case of Gray & Bouton, under which the sale is claimed to have been made, was a ven. ex. directing the sheriff to expose to sale the property levied upon by virtue of the first fi. fa. without any reference to the corner property in dispute and which complainants claim to have purchased by virtue of this and other writs. The question is, (aside from all other considerations,) could the sheriff sell other property under this writ than that set forth in it, and which he was therein commanded to sell. It has been held upon high authority that the only questions which can arise between an individual claiming a right under the acts done and one denying their validity, are, power in the officer and fraud in the party. United States v. Arredondo, 6 Peters 729. Vorhees v. The Bank of the United States, 10 Pet. 478. In the case which we are considering, had the sheriff power to sell the property in dispute? This involves an inquiry into the source and extent of his power. Chief Justice Sharkey, in the case of Minor v. The Select men of Natchez, 4 S. & M. 631, investigated this point with much care and concludes his opinion by saying, “The judgment is evidence of the liability of the property, and the execution is evidence of the sheriff’s general authority ;” and in an earlier part of his opinion he expressly denies that the officer derives his authority from the statute, but limits it to the .judgment and execution. He says, “The. truth is, the sheriff derives his power not from the statute but from the judgment and execution.” And such also was our decision in the case of Adamson et al. v. Cummins’ ad’r., reported in 5 Eng. 545. Assuming it to be true, then, that the sheriff’s power to sell is thus derived, and looking to the evidences of that authority, we find him commanded to expose certain lands to sale, which had been before that time taken in execution. No power is given to levy on other property or to sell property previously levied upon and not embraced in his writ. But it is contended by counsel that, as the judgment created a lien upon the whole of the defendant’s lands, there was no necessity for a levy. We have already dissented from the truth of this proposition. But if this be true, for what purpose does the writ offi. fa. issue? Not to place the property in custody of the law if the lien has effected this purpose, nor to ascertain the amount of the debt, the same judgment that gives the lien furnishes the highest evidence of this; nor to confer power to advertise the property, for the law requires this to be done; nor to ascertain what is “sufficient property” to satisfy the debt, for all of the lands are alike bound, and if any part of it is in custody of the law, it is all equally so. In short, there can be, under the doctrine contended for, no pos-Bible use for the writ offi.fa., and all the statutory provisions in regard to a levy and sale of land under judicial process, is a mere dead letter, for the same law, which places the property in legal custody, upon principle may also be said to confer power on the officer to sell. The sale then would be under the authority of law, and not of judicial process, which would be alike contrary to the statute, the rights of the defendant under its provisions allowing him to select and point out property at his pleasure if of sufficient value, and the opinion of Chief Justice Sharkey and the array of authorities he presented in the case of Minor v. The President and Select men of Natchez, as well as our own opinion in the case of Adamson v. Cummins' ad'r. In each of which, after full investigation, it was held that the sheriff derived his power to levy and sell property not from the statute but from his writ. The lien therefore, in our opinion, neither supplies the necessity for, nor office of a writ, to which we must look for power in the officer to sell. It is argued again, if the judgment lien is not of itself sufficient for this purpose, that when a levy is once made the sheriff acquires such an interest in the property as to enable him to sell without a writ after the return day thereof. It is true that there is a rule to that effect in regard to the sale of goods, which was founded on the supposed change of title in the goods by virtue of the levy, and in the fact that they were presumed to be in the sheriff’s possession, and the title to which after sale passed by delivery. Yet even this rule when applied to goods (and we will not say that it does not apply to them), was founded upon principles and grounds which no longer exist. The old rule that a levy divested the owner of title to the property, fell with the doctrine of absolute satisfaction. The reasons for the distinction are, that the purchaser of lands at judicial sale derives title from the judgment, the writ and the proceedings under it; and the law requires that such proceedings shall be returned upon the writ and filed as part of the records under which title is derived. Not so in a sale of goods under a levy; they pass by delivery, not by written record evidence. This point, however, is settled by numerous decisions, amongst which are the cases of Falkington v. Alexander, 2 Dev. & Bat. 87. Smith v. Spencer, 3 Iredell 265. Badham v. Cox, 11 N. C. Rep. 458. And it is equally clear that the office of the writ of ven. ex. is not, in the case of the sale of lands, a mere command to hasten the action of the sheriff, to require him to do that which he had power to do independent of the writ of ven. ex.; but it confers upon him the power to sell as well as commands him to proceed to do so. The levy was made under the first writ, which, when returned, was functus officio. The ven. ex. relates back to the ji-fa. and the levy and return upon it, and the power of the officer commences under the ven. ex. just where the sheriff under the ji. fa. stopped. He had levied whilst the ji.fa. was in force, but his power was revoked by limitation before sale; the ven. ex. therefore does not confer power to levy; that had already been done; but it does confer power to sell, because the power under the ji. fa. had not been executed in that particular. These two writs are in fact but one writ, the latter being designed to complete what had been commenced. Hence the recital of the proceeding on the Ji. fa. in the ven. ex., and following it the command not to levy, but to expose to sale the property heretofore levied upon. If any doubt could arise from the nature of the trust or the language of the writ, there are many adjudications sustaining the view which we have taken. In the case of Lessees of Bowl v. King, 6 Ohio Rep. 3, the question arose just as it does in the case before us, as to whether a levy under a voidji.fa. could be executed under a valid ven. ex. The court said “The valid vendi. does not supply the defect of the original ji. fa.. The prelude of the vendi. is a previous valid writ of ji. fa. and a valid levy upon it: there must have been a seizure in execution upon authority to seize. This the vendi. could not confer. The direction to sell is not an authority to take.” 11 N. C. Rep. 458. 4 Bibb 344. 4 Teates 108. We think it evident, therefore, that the sheriff derived his power to sell from the writ and not by force of a previous levy, admitting such levy to have been made under valid process: and that the writ of ven. ex. conferred upon him no power to levy, but simply to sell the lands described in his writ as having been previously levied upon and remaining unsold. It follows therefore that either a levy or sale of other property than that described in his writ, were acts beyond his authority; not an erroneous exercise of power granted, but an assumption of power not granted; and is for that reason void. Pitman v. Wiscolt, 19 John. Rep. 76. Whiting & Slark therefore could acquire no title under this process. We will next enquire whether they acquired title under the judgment lien of Beach. The only difference between the writs in this and the Gray & Bouton case was, that the last writ contained also afi. fa. clause authorizing a further levy and sale, if the first should prove insufficient. Several of the questions which might arise on this writ, we have already disposed of whilst considering the like condition of the writs in the case of Gray & Bouton. We will therefore turn our attention directly to the consideration of a point raised with regard to the sufficiency of this writ which may of itself determine its validity and the effect of a sale under it independent of any other consideration. It is contended that a written release and acknowledgment of satisfaction was entered of record by the plaintiffs by which Thorn, the joint judgment debtor with De Baun, was discharged and that this discharge as to one was in law a discharge and satisfaction as to both. The record entry is as follows: Lewis Beach, Plaintiff, vs. James De Baun & Thomas Thorn, Defendants.) Judgment entered 27th March, 1840, for $1,988 50 debt, and costs. The said defendant Thomas Thorn having arranged and secured to the satisfaction of the attorney of said plaintiffs (Trap-nail & Cocke) the judgment in this case, they do hereby and with the consent and agreement of said James De Baun, acknowledge full satisfaction of the said judgment so far as the said Thomas Thorn is concerned, without prejudice to the rights of the said plaintiff to sue out executions and recover the said judgment and costs of the said James De Baun. TRAPNALL & COCKE, Atfys May 27, 1840. for Plaintiff. Test: Lemuel R. Lincoln, Cleric. I, James De Baun, do consent to the above satisfaction in the manner and form as therein provided. ' May 27, 1840. JAMES DE BAUN. This entry is in accordance with the provisions of the statute, Pig. p. 625, which authorizes the entry of satisfaction of judgments by the plaintiff or his attorney of record, the 26th section of which provides that a satisfaction entered in accordance with the provisions of the act shall forever discharge and release the judgment. If the discharge had been made by the plaintiffs in person, there is no doubt but that it would have been in law a full satisfaction and discharge as to both defendants; upon the principle that as the creditor is entitled to but one satisfaction, though made by one it enures to the benefit of both. Coke Litt. 232, a. note 164. Rowley v. Stewart, 8 John. 209. Ferguson v. State Bank, 6 Eng. 514. Bruton v. Gregory, 3 Eng. 180. Bozeman v. State Bank, 2 Eng. 333. And even where it is expressly understood and is made part of the terms of release and satisfaction, that such shall not be its effect as against other defendants, it has been held to extend to all. 2 Ham. Ohio Rep. 263. In the case before us, the satisfaction was not enteredby the plaintiffs but by the attorneys of record; and it is a matter of doubt whether they, for the consideration expressed, could make a release which would bind their clients. We have repeatedly held that any attorney under his general retainer as such could not accept in satisfaction of a money demand, property or depreciated paper. Jackson v. Bartlett, 8 John. 361. Nenaus & January v. Lindsey, 1 Row. (Miss.) 577. Keller, use, &c. v. Scott, 2 S. & M. (Miss.) 82. Kellogg & Co. v. Norris, 5 Eng. 18. Norris v. Kellogg & Co., 2 Eng. 112. Griffin v. Thompson, 2 How. (U. S.) 257. Codwin v. Field, 9 John. 263. Johnson v. Cunningham, 1 Ala. R. 258. Wickliff v. Davis, 2 J. J. Marsh 71. Randolph v. Ring gold et al., 5 Eng. 281., And if the consideration was expressed in the instrument executed by the attorney, it might readily be seen whether in this respect objectionable or not; but the language, whilst full and unqualified as to the discharge of Thorn and the sufficiency of satisfaction, leaves it a matter of doubt whether they were paid in money or property, or whether other security had been given. They say, “Thomas Thorn having arranged and secured to the satisfaction of the attorneys.” We may readily infer from the language used that something besides money was received, and this may be met by the presumption that the attorneys would not act without authority, and that they were specially empowered to receive other satisfaction than money; or that they would not have received it. If left without other considerations than such as are to be drawn from the instrument itself, we would very much question the sufficiency of the satisfaction. It appears, however, Beebe, who has succeeded to the rights of the plaintiff by assignment, fully recognizes and affirms this act of the attorneys, and asserts and sets up in his answer, that it is a full and complete satisfaction as to Thorn, and if so as to Thorn then also by operation of law as to De Baun. It is true that De Baun might and in this instance probably has estopped himself from setting up this satisfaction; yet it is not the less true that the satisfaction is complete. Estoppel is not the denial of the existence of a fact, but a denial of the right to interpose it. It is unnecessary to press this enquiry further. The plaintiff had an undoubted right to recognize and affirm the acts of their attorneys, whether they had at the time power to have thus acted or not; and that they have done so to the fullest extent, is beyond all doubt. And therefore in the further consideration of this case, the judgment, so far as third persons, lien creditors, are concerned, will be considered as satisfied and the lien discharged. Whiting & Slark therefore could acquire no title to the property in dispute under a judicial sale based upon the judgment and excution in this case. There was no valid judgment in force, and of course no valid sale could be predicated upon it. Having thus disposed of the judgments and the process which issued upon them, it is apparent that a consideration of the acts of the chancellor or the parties in,conducting the sale could in no respect change the result, and would be a useless consumption of time. We will therefore pass them. There was evidently no valid levy and sale of the property in dispute, and of course no specific execution of the contract of purchase should be decreed. The next question for consideration is, as to whether adverse title to the mortgaged property has been acquired by purchase' under senior judgment liens. If so, there is an end to the matter, so far as complainants’ title to the property is concerned. The bill as originally framed was intended to control the order of sales under judicial process, so as to protect the junior lien of the complainants, whose mortgage embraced only a portion of the mortgager’s real estate, and to foreclose the mortgage and subject the lots of land to sale for the payment of their debts. Subsequently, the complainants themselves bought under the senior judgment liens, and subsequent to their purchase, defendant Beebe also bought under the same senior liens: whereupon, on leave previously given, complainants filed their supplemental bill reciting in substance the material allegations in their former bill and setting out their purchase under the senior lien and the sale thereafter made to Beebe, which they allege to be fraudulent. They repeat the prayer for the relief asked in the original bill, and that the title so acquired by defendants be set aside, that defendants account for rents and profits, and that the sheriff be compelled to execute a deed to them, or that the court will decree them a title to the property in dispute. The bill, and the supplemental or amended bill, are to be considered one complaint, setting forth two grounds of equity; the one arising under the claim as purchasers at judicial sale; the other as creditors under a mortgage, junior to several other claimants. Upon the first ground, we have already decided. Our consideration is now to be directed to the rights of the complainants under the mortgage. If there existed a senior lien under which Beebe pm-chased, then there can be no doubt (u nles the proceedings were void,) that he acquired a legal title to the property, which can only be overturned by the complainants’ superior equity. If, however, there was no such lien, then of course the complainants would become the senior in time, and hold without showing other equities. Conceding such senior lien on the part of the defendants to exist, (which they deny), complainants say that the lien of Gray & Bouton was discharged by payment of the judgment; and if not by payment, it was suspended by a prior subsisting levy: that the purchase was pendente lite and void; and that it was also discharged by the fraudulent conduct of the defendant. These several grounds of equity we will proceed to examine.Preliminary to this, however, arises a question of the admissibility of evidence. It is contended that Trapnall’s answer cannot be used as evidence against Beebe; and upon this point we are referred to authorities. As a general rule, it is true, that the answer of one defendant cannot be used against another. To this rule there are exceptions; one of which is thus laid down in Daniel's Chancery Pleading and Practice, Vol. 2, page 982: “ In case, however, where the rights of the plaintiffs, as against one defendant, are only prevented from being complete by some question between the plaintiff and a second defendant, it seems that the plaintiff is permitted to read the answer of such second defendant for the purpose of completing his claim against the first.” In Morse v. Royal, 12 Vesy 355, the answer of an executor was offered as evidence against the residuary legatee who had been made a party to the suit, was received to show that funds came to the hands of the executors, what debts there were and the value of the estate. And in a case where the question arose' under circumstances very similar to those in the case before us,Chief Justice Marshall held, that where one defendant was called upon to discover facts designed to be used by the complainants, to fix a liability on, or defeat the title of a co-defendant, that such co-defendant may use the answer of his co-defendant as evidence against the complainant; and, of course, if the answer had been favorable to the complainant, he might have used it against the other defendant. As this is the first time the question has been presented for the consideration of this court, it may not be amiss here, to present the precise state of case before Judge Marshall at the time he delivered his opinion, together with a brief extract from it, that its weight, as an authority, may be more clearly felt. Holland, in 1793, obtained judgment against Cox, which, from that date became a lien upon his real estate. On the 3d of September, 1794, Shepperd bought certain lands of Cox, and took from him a deed, by which he acquired a legal title, subj ect however, to the prior lien of Holland. In 1799, executions issued, and the lands so sold to Shepperd were levied on and bought at sheriff’s sale by Chilton — Gibbons, the agent of the plaintiffs, objecting to the sale. The bill was filed by Shepperd against Holland and Cox, Chilton and others, to set aside the sale made by the sheriff, and the deed under it, on the ground, that before the sale so made, the judgment had been fully satisfied. Holland, Cox, Milton, plaintiff, defendant and purchaser, are in the case before us represented by Gray & Bouton, De Baun and Beebe. And Whiting & Slark, that of Shepperd, with this difference, that they held by deed of mortgage, whilst Shepperd held by deed in fee simple. In that case, the question was, whether Holland’s answer could be used as evidence for Milton, and in this, whether Trapnall’s answer, the representative and agent who transacted the business for the plaintiffs can be used as evidence against Beebe, the purchaser. Under this state of case, Chief Justice Marshall said: " The whole equity of the plaintiffs depends on the state of accounts between Holland and Cox. They undertake to prove that the judgments obtained by Holland against Cox are satisfied. Surely, to a suit instituted for this purpose; Holland and Cox are not only necessary, but proper parties. Had they been omitted, it would be incumbent on the plaintiffs to account for the omission, by showing that it was not in their power to make them parties. Not only are they essential to a settlement, but in a possible state of things, a decree might have been rendered against one or both of them. Nor is it to be admitted, that the answer of Holland is not testimony against plaintiff. He is the party against whom the fact that the judgments were discharged is to be established, and against whom it is to operate. This fact, when established, it is true, affects the purchasers also, but affects them consequentially, and through him. It affects them as representinghim. Consequently, where the fact is established for or against him, it binds them.” Field et al. v. Holland et al., 2 U. S. Con. Rep. page 290. And in the case of Osborn et al. v. The Bank of the United States, 9 Wheaton's Rep. 733, the same court said: “It is generally but not universally true, that the answer of one defendant cannot be read against another. Where one defendant succeeds to another, so that the right of one devolves upon the other, the rule does not apply. Thus, if a defendant die pending a suit and the proceedings be revived against his heir, ror against his executor or administrator, the answsr of the deceased person, or any other evidence establishing the fact against him, may be read against his representatives. So, a pendente lite purchaser is bound by the decree without being made a party to the suit; a fortiori, he would, if made a party, be bound by the testimony taken against the vendor.” Looking to the issue formed, and the relative position of the parties in interest, we think it very clear that the answer does come within several of the exceptions stated: First, as under the exception stated in 2 Daniel. The rights of Whiting & Slark as against Beebe, are only prevented from being complete by the question of satisfaction, between complainants and Gray & Bouton and their agent: and in the second instance, as in the case in 12 Vesy, 355. The object of the evidence is to show the amount of credit to which the judgment was entitled.” In the case in 2 Cond. Rep., the counsel for Beebe contend that the answer of Holland was to be used against the complainant, not the defendant; and, therefore, it is not an authority in point, although the reporter so considered it, and placed it in his head note of the report. We think in this the reporter was not mistaken. Chief Justice Marshall placed it on the ground of a discovery sought by the complainant upon a point which would '.affect the defendant answering, directly, and the purchaser, consequentially. The right to the discovery is expressly recognized by judge Marshall as well as its effect upon the defendant. Can any one believe that the complainant would have a right to a discovery, but not a right to use it when made? Certainly not. Why was it that the co-defendant had a right to use it against the plaintiff? Surely for the very reason that if it had established facts against such defendant, it would have been evidence against him, and this is what the judge meant when he said, “ This fact when established, it is true, affects the purchaser also, but it affects him consequentially, and through him it affects them as representing him. Consequently, where the fact is established against or for him it binds them.” The case in 9 Wheaton still presents another, and, if possible, a still stronger ground of exception than either of the others. It is “that a purchaser pendente lite is bound by the decree, and if by the decree, he is bound by the testimony when against the vendor, even though he be not made party to the suit. And here, before we further proceed to investigate the admissibility of the answer as evidence, we are met by another preliminary question: Was Beebe a purchaser pendente Hie ? If so, in what attitude does it place him in the investigation of the merits of this case. A purchaser pendente lite is one who, by purchase, acquires an interest in the matter in litigation pending the suit. The reason of the rule is, that if a transfer of interest pending the suit was to be allowed to affect the proceedings, there would be no end to litigation; for as soon as the new party was brought in he might transfer it to another, and render it necessary to bring that other before the court: so that if this interference be allowed a suit might be interminable. And the rule, it would seem, applies with increased force to suits in rem, or where the title to the property purchased pendente is in litigation. Some decisions go so far as to declare all such titles absolutely void. The rule, says Gheen, Judge, in the case of Newman v. Chapman, 2 Rand. R. 100, as to the effect of lis pendens is founded on the necessity of such rule to give effect to the proceedings of & court of justice; without which every judgment and decree for specific property might be rendered abortive by successive alien-ations.” This rule is particularly applicable to proceedings in rem and in contests for the title to property, where the decree or judgment of the court is to affect the title to such property. For the reasons above given, the title acquired by a purchaser pending such litigation has, by some of the courts, been held absolutely void, Gordon v. Payne, 9 Dana 190. Briscoe v. Bronaugh, 1 Texas Rep. 333. Worsley v. Scarborough, 3 Atk. 392. These decisions, if restricted to the effect of the title thus acquired upon the rights of the parties to the subject matter at issue at the time of the purchase, are sustained upon high authority. Thus, in the case of Murry v. Lyburn, 2 John. Ch. Rep. 445, Chancellor Kent said: “There is no principle better established, nor one founded on more indispensable necessity, than that the purchaser of the subject matter in controversy pendente lite does not vary the rights of the parties in that suit, who are not to receive any prejudice from the alienation.” In the case of Gordon v. Payne,it was said, “The sale made by him was clearly invalid upon two grounds: First, it was made pendente lite and after the jurisdiction of the Chancellor had attached; consequently, no sale or other act of the executor afterwards, could change the attitude of the party or the right of the parties.” Gordon v. Payne, 9 Dana 190. “ He who purchases during the pendency of a suit, is bound,” says Sir William Giiant, “by the decree that may be made against the person from whom he derives title. The litigating parties are exempt from the necessity of taking notice of a title so acquired. As to them, it is as if no such title existed; otherwise, suits would be interminable, or, which would be the same in effect, it would be in the pleasure of one party at what period the suit should be terminated. The rule may sometimes operate with hardship, but general convenience requires it.” The Bisdop of Winchester v. Payne, 11 Ves. 194. In the case of Scott v. McMellen, 1 Littell 307, the court took a distinction between suits for mere preliminary demands, and a ,suit where the court was investigating rights to property by proceedings in rem. After considering the first class of cases the court proceeds: “Here the complainant was compelled to resort for relief to a court possessing no jurisdiction over the person of the debtor, but possessing competent power over the property Here the property gives jurisdiction to the court; the right of property is in the court, and during the pendency of such a contest no transfer of the property by the debtor can be admitted to produce any prejudicial effect on the complainants demand. In this case we attach no consequence to the circumstances of an injunction having'been granted by the court to restrain the defendant from conveying the property. But we go upon the broad and general principle, that after the commencement of Scott’s suit, and a lis pendens created as to the property, no conveyance of the property by Sam. McMillen can prevail. This principle was adopted at an early period in the history of chancery jurisprudence, has been followed and acted on ever since, by various successive Chancellors, and finally is admitted by all elementary writers on the subject to be the established doctrine of the court.” These authorities, we think, clearly establish the following positions : First, That the institution of the suit (particularly where it relates to the title or disposition of property) is constructive notice to all purchasers after suit commenced. Second, That a purchaser pendente lite acquires no title by his purchase, which he can set up or assert to the prejudice of the rights of the pai'ties litigant, and that the suit will be heard and determined upon the merits as it stood between the parties litigant, perfectly irrespective of any rights which he may have acquired by such purchase, which, if valid for any purpose, can only be so as between himself and his vendor, to enable him upon the determination of the suit to succeed to the rights of such vendor, or, perhaps if a party to the suit, to enable the court after determining the rights of his vendor favorably, to decree them to him. The counsel for Beebe, for the purpose of avoiding the force of these authorities contend, first, That although Beebe, if a third person, would have been subject to the rule governing the rights of purchasers pendente lite, yet, as he was the purchaser of the judgment before the institution of suit by Whiting & Slark, that he succeeded to the equitable rights of Gray & Bouton, who were senior judgment creditors, and that as such he had a right to pursue his remedy as fully and to the same extent as they could have done. Conceding this to be true, or even put it on a stronger ground, and say that Gray & Bouton had themselves been the purchasers under their own senior lien, the question recurs as to whether (after the institution of a suit contesting their right to sell, claiming that their judgment had been satisfied by a prior levy, which was undisposed of, that there was also other sufficient estate out of which to satisfy the senior judgment lien, without coming upon the property embraced in the complainants’ mortgage; that $2,800 had been paid on said judgments, but which had not been credited thereon: all of which was distinctly averred in the original bill filed against them,) they could until these rights were settled and determined, sell the property, the title to which was thus fairly put at issue between the senior and junior lien creditors, and acquire, under such purchase a title superior to that which they held under their judgment lien, or which could aid or strengthen it. If so, then it amounts to an infringement of a rule, a maxim founded in reason, that the vendee can, by his purchase acquire no greater title than his vendor possessed. It would be, in effect, offering a title derived solely under his equitable right then at issue, in defence of those rights. Such could never be the case. On the contrary, the rights of this property were fairly put at issue, turning upon the fact as to whether there was other property belonging to.De Baun, sufficient to satisfy the senior lien which covered his whole real estate, and the junior mortgage lien which extended only to a small portion of it: and the further independent fact as to whether the judgment had been discharged by payment. And upon the soundest principles of equity, we feel fully warranted in going further, and saying even if all of the judgment had not been discharged by payment, if a considerable amount of it had been paid, but which from carelessness or design, the plaintiffs in the senior judgment had failed to enter as a credit, that the junior creditor would have a right to demand that these credits be made out and entered before sale; because he would have the right to pay off the senior encumbrances, and thereby disencumber his junior lien, which he could not do, nor could he be prepared to elect whether he would or not, until the credits were entered. That Gray & Bouton could not have acquired a title under such purchase, which would have in any wise aided their equitable defence, we think very evident. And if they could not do so, Beebe, who claims under them and assumes to cover himself from the effects of the rule as purchaser pendente lite, cannot. But then the counsel have assumed another ground, which, though not at all reconcilable with their first position, we will for a moment consider. They say that Beebe purchased of Gray & Bouton, before the commencement of the suit. That is true. They took the judgment by assignment. By that we apprehend they only purchased the right to the judgment, that is, took the place and stead of Gray & Bouton, but not the property in dispute. After the most attentive examination of the grounds assumed by the counsel of Beebe, we find nothing which will relieve him from the necessity of relying solely upon the equitable right at issue between Gray & Bouton on the one hand, and Whiting & Slark on the other, so far as his title rests upon the equity growing out of their prior lien. When therefore the complainants call upon Gray & Bouton and their agent to answer as to whether this judgment has in fact been paid, what right has Beebe to object and say you are not entitled to use their answer, because I am a co-defendant, and it may cause them to lose their suit, and then I shall get no title under my deed from them ? Viewed as a third person he need not even have been made a party. His rights are wholly depen-dant on the merits of the issue between the original parties. It is their suit, not his; or if viewed in the stead of Gray & Bouton their answer is his answer, their defence his. Thus considered there is no doubt but that this is a clear exception to the general rule, for it is only in a limited sense that Beebe can be called a party to this suit. Whiting & Slark then call on Gray & Bouton, and Trapnall,their agent, to answer andsay whether this judgmentwas or not paid. Gray & Bouton entered their appearance but failed to answer, and the allegations, if they alone had been called to answer touching their interests, would have been taken as true; but in this case, the complainants have also made their attorney and agent, Trapnall, a party, who transacted the whole business and whose answer must be considered as in effect their answer. It will bereceived then, as evidence for and against the complainants and defendant as fully and to the same extent as if made by them. Upon the question of payment, the records and the answers of Trapnall and of Beebe (for that like the answer of Trapnall has been called out by the bill and so far as it is responsive to the issue between the parties, upon the merits of the respective cl aims of Gray & Bouton, and Whiting & Slark to the property in dispute, will be received with like effect as the answer of the party in original interest would) comprise the whole of the evidence. Turning first to the record, we find the original debt by note to be $1,811 89 due 19th March, 1837, at 6 per cent.interest after due. Beebe admits thathe was apprised at the time of his purchase that credits for payments before that time made, should have been but were not entered upon the judgments; but does not remember whether before or after the complainants’ mortgage was executed, nor does he give the amount, but states that excluding costs he paid in December, 1843, to Trapnall, $2,400, or thereabouts for both judgments. Trapnall’s statement is definite and gives precise dates by which we may arrive at the sum due on this judgment. He says that there was paid on the note $1,025 14, on the 25th of January, 1839, which should have been credited on it. It will be seen by calculating the interest up to Hie payment and crediting the note by the $1,025 14, as should have been done, that there was at the time judgment was rendei*ed, only due about $996 15 instead of $2,137 89, besides costs, and on the day that Beebe purchased the property in dispute at the November term, 1843, there was due, debt, interest and costs, about $1,301 53. Itfurther appears from the return on the writ of ven. ex. with fi. fa. clause that there was sold under the Gray & Bouton judgments property to the amount of $1,875, of which the property in dispute sold for $325, and that after deducting this amount and the whole costs of sales left a balance of $1,528 82, being $22,7 29 more than sufficient to satisfy the whole balance of the Gray & Bouton judgment; and that other property of De Baun on the same day, was sold on other process to the amount of $685. Suppose these facts had been presented to the chancellor, can there be any doubt what his decision would have been ? Surely no one will contend but that the senior lien creditor, when he had sold enough to satisfy his demand, should have stopped and left the junior creditor to the benefit of his lien; but if not, it was clearly the privilege of the junior lien creditor to have paid up the senior lien debt and have protected himself from the utter loss of his debt when the property, from data abundant in this record, was worth more than twenty times what it sold for, and which has rented for more every year since (as far as reports of rents are before us) than it sold for, and the withholding proper credits, whereby there was presented a demand of $2,346, or about that sum, instead of $1,301 53, the amount really due, was a gross violation of the rights of creditors, thus saying to them, my demand is $2,346, which you must pay in order to avail yourself of the benefit of your lien. Beebe and Trapnall both knew of these credits : they were claimed and relied upon in the bill of complaint in this suit and a failure to enter them, whether intentional or not, cannot be viewed otherwise than unjust and oppressive, if not grossly fraudulent. Turning from this to another ground of objection to the validity of this sale, we will proceed to inquire whether in point of fact, there was any existing lien at the time of the levy and sale. A lien is a right by law, says Chief Justice Shaekey, to have a debt satisfied out of a particular thing. It may originate by contract, or by operation of law. In either case the effect is the same. It is a right given by law to have the debt satisfied out of all or anymf the defendant’s property. Anderson v. Doe ex dem. Wilkins, 6 How. 562. Chancellor Kent, in his commentaries, vol. 4, page 437, when referring to judgment liens, says “the lien, after all, amounts to but a security against purchasers and encumbran-cers, for as the Master of the Rolls said, in Bruce v. The Duchess of Marlborough, it is neither jus in re nor jus in rent. The judgment creditor gets no estate in the land, and although he might release all his right to the land, he might afterwards extend it by execution.” A judgment creditor has no jus in re but a mere power to make his general lien effectual by following up the steps of the law. A failure to do this releases the charge on the property.” Massengill et al. v. Down, 7 How. U. S. Rep. 767. From these authorities it may be said that a judgment lien is a security against subsequent purchasers and incumbrancers, which denies to the debtor the right to alien or encumber his property, to the prejudice of the rights of the judgment creditor for a given period (in most instances fixed by the statute.) It is also a right springing out of, and dependent upon, the judgment for its existence and follows the condition of the judgment. If the judgment is reversed or set aside, the lien is co instanti discharged; if paid, it is merged in the payment; if suspended by injunction or su-persedeas, the lien is also suspended; and therefore asa levy operates as a prima facie satisfaction and whilst undischarged satisfies and suspends the judgment, the lien must also be suspended with it, and should the lien prove insufficient to satisfy the judgment, as by the discharge of the levy, the judgment is restored to its full effect upon the estate of the debtor, so also does the lien, unless in the mean time it has expired by limitation, or has been discharged by the act of the creditor, upon the return of the creditor for further satisfaction, maintain its grasp upon the whole estate of the debtor to the full extent that it did when first created, (Estill v. Mitchell, 8 Yerger 452), and intermediate sales of property by junior lien creditors, or by the debtor between the first levy and the discharge thereof, if such discharge takes place before the statute- limitation, will be held subject to such lien. 2 S & M. (Miss.) Rep. 436, Perkins v. Marlow. This brief review of the definition of a lien and of its dependencies, is designed to illustrate more clearly our views of its nature and the foundation upon which it rests, which, we have said, is a right, a security given by law to the creditor upon the property of the debtor, which is not an intrinsic quality of the judgment itself but is a quality added to it — an effect of the mere existence of the judgment, which can have no independent existence, but is dependent upon the judgment and follows it as a shadow does a substance; hence if it is cut off from it either by the act of the party, the satisfaction or extinguishment of the judgment, or by limitation of time, upon general principles it is lost, for then there ceases to be any thing to which it can be attached. This rule will be found in perfect harmony with the common law rule in relation to liens on personal property. Liens at common law only attach to property in actual possession; remove the property and the lien is lost. Bouvier’s Law Dictionary, vol, 2,page 54. In fine a lien being a mere contingency or right dependent upon a subsisting thing, of course cannot rest upon a contingency, no more than a presumption can rest upon another presumption, or one contingency upon another or a shadow exist without a substance. Having premised this much in regard to the nature and effect of a lien we will proceed to apply these rules to the facts of the case before us! The lien on the Gray & Bouton judgment expired on the 23d of March, 1843. On the 20th of March, three days before the lien expired scire facias issues to revive the lien, and it was revived on the 16th Jaffy, 1846. In June, 1843, after the lien had expired and before it was revived, the property in dispute was levied upon, and sold atthe November term, 1843, by virtue of the judicial process so levied. Under a purchase at this sale Beebe claims to hold the senior lien of Gray & Bouton. It will be seen that both the levy and the sale were made after the lien had expired by limilation and before it was revived by sci.fa. The question is, did the revival of the judgment in 1846, relate back to his purchase so as to constitute him a purchaser under a senior lien. If so, it must be by force of the statute alone, to which we will presently revert. At the time of the levy and sale no lien attached to the judgment, because the lien had ceased to exist by limitation, aqd if it did not exist in the judgment, to what else could it attach ? Not in the sci. fa., that was the mere process of the court to bring the debtor before it. Under this state of case it could, at best, be said to rest upon a contingency, which might or not happen; and we have seen that from its very nature it cannot thus exist, or it must have lain dormant at the time of the levy and sale dependent still upon the same contingency. Concede however, that it could rest upon a contingency and that a sale might be effected under such lien: let us for a moment glance at the practical operation of such a proceeding, and a more apt illustration of disastrous consequences and confusion which would follow could scarcely be presented than the case before us. Here we have some ten or twenty judgment creditors with liens in force, deeds of trust and a mortgage, all except the two last covering the whole of the real estate of a debtor consisting of numerous lots and tracts of land brought up to be sold. The senior lien has expired but a writ has been sued out to revive it. Whether it ever is revived or not must depend upon the chances of future legal determination and the mere will of the plaintiffs in that suit. If they buy the property they may prosecute their sci. fa. to judgment; if they do not, it is a matter of no concern to them: they pocket the money which should or not be theirs, dependent upon the same contingency. Other creditors are told to pay off this debt and admit them to be the senior lien creditors, when they certainly are not then and may never be such. They must do this or stand by as was done in the present case and see property admitted to be worth from ten to twenty thousand dollars sold for three hundred and twenty-five. Should it be said that this proceeding is likened to the purchase under a junior lien, that it is held subject to the claims of the senior, the response is, that there is an existing right upon which such contingency may rest, but here there is none. As we have before remarked, it is a contingency upon a contingency. But how long shall these creditors wait to ascertain the happening of the contingency which overshadows their rights ? How long shall the debtor himself be perplexed with such encumbrances? It must be apparent that this doctrine if allowed, gains no credit for its equity and overshadows a pervading principle in our administration of the law, which encourages bidders at judicial sales by giving them assurance of a good title and also relieves the oppressed debtor from the utter sacrifice of his property. We repeat therefore, that if such is the case it must be by force of the statute and not from any of the known principles or rules applicable to liens. The statute makes the judgment, from its date, a lien on the lands of the debtor situate in the county in which it is rendered, for the term of three years from its date. It also confers a right on the creditor to revive his judgment lien by suing out a scire facias at any time before the lien expires: and then, in the 13th section, provides, that if the sci. fa. be sued out before the lien expires, the lien of the judgment revived shall have relation to the day on which the sci. fa. issued; or if it issued after the lien has expired, then from the date of the judgment of revival. The only important question arising under the statute is as to the effect which the judgment lien when revived is to have upon the propei’ty of the debtor at the date when the scire facias issued. Shall we give it effect over all the debtor’s property which the former lien had, irrespective of intervening equities which may have arisen between the creditors themselves during the suspension of the lien ? or shall we so construe the act as to protect those rights ? That the Legislature intended to connect the revived with the former lien, so as to continue its existence is very evident; but there is no language used by which to determine the extent of the revival. If they meant to restore the lien as fully as it at first existed, it must evidently have been with reference also to the rights as between creditors which accrue to the junior creditor by extinguishment, by acts of the parties, or otherwise, for these might have accrued under the first lien. There are two distinct features in a statute judgment lien. The first and paramount object of the lien is, to prevent the debtor from alienating or encumbering his property to the prejudice of the rights of his creditors: The second object is, to discriminate in priority of right between the creditors themselves. And this latter is an equitable distinction founded on the rule that, equities being otherwise equal, he, who is first in time, is prior in right. In the first'instance, the rights are as between the debtor and his creditors: in the second; as between the creditors themselves, which latter provision has no reference whatever to the debtor, but relates solely as between the creditors themselves, and are purely equitable, giving preference, as between the creditors whose equities are in other respects equal, according to priority of time. And the same principles of equity are applied to, and govern the rights of creditors in every contest for satisfaction. Thus, when the senior creditor, by contracting for other security, by fraud or other act, forfeits his right of lien, it is so considered upon the ground that he thereby sinks his equity in degree, so that it ceases to be equal to that of the junior lien and therefore time does not give prior right. For the rule as to time only applies where equities are equal. It is also worthy of remark that this rule of discharge of lien by the act of the party has no application as between debtor and creditor. As respects the debtor the lien is only discharged by limitation or satisfaction of the judgment. When therefore the Legislature declared that the judgment lien when revived, should relate back to the date of the sci. fa., we may well suppose thatit intended the lien when revived to act upon the whole estate of the debtor, to the same extent that it did prior to its suspension by limitation, in an unqualified sense, as related to the debtor; and that it also revived all the secondary rights of the senior creditor as between himself and the junior creditor, subject however to such intervening equities as might have arisen between the time of the suspension and the revival of the judgment, for these rights might have accrued to him even under the first lien. Any other construction than this would place the creditor under the junior judgment liens, in a worse condition than he was, under the lien before it expired and would defeat the principles of equity which have universal application in such cases. We must not presume therefore that the Legislature intended to cut the creditor off from the benefit of intervening equities which might constitute his the better equity. There he had no opportunity to protect them. The issue upon the sci. fa. was between the seilior creditor and the debtor, and as to him, even though the debt may have been paid (as was the fact in the cases before us) if he failed to plead such payment, the judgment is good against him. But shall we say that it is also good against the junior creditor, who could not be heard in that suit? And yet, if the lien when revived, is to act alike upon the rights of the debtor and the creditor as they existed at the time when the sci. fa. issued, the result must be that even though the senior judgment be fully paid and discharged, this revived judgment lien would override and defeat the equities of the junior creditor arising therefrom. Such never could have been the intention of the Legislature; nor have they in this instance used language which necessarily implies that such should be the case. We therefore hold the true construction of the act to be that the revived judgment lien is held subject to such intervening equities as may have arisen between the creditors themselves, between the date of the sci. fa. and the rendition of the judgment reviving such lien. In the case before us, at the time the levy and sale were made the lien had expired by limitation. The plaintiffs’ rights under it were, if existing to any extent, dormant or suspended, dependent upon a contingency which might or not happen at an indefinite time. Suppose such to have been the case at the outset, would the plaintiffs’ have been held a better equity than one whose claim, though junior in time, was in full force and ready for execution? We should say not. And if not, then is there any good reason for holding it to be a superior equity, if such should become the case at a future time? If so, it would be upon the ground that an equity once acquired could not thereafter be lost. In this case the sale was not made under a junior judgment lien; but the senior judgment creditor, during the suspension of his lien, sells the property and becomes himself the purchaser, or rather Beebe, who succeeded him in interest, did so. Under this state of case, the question is, did he acquire a title as senior lien creditor? At that time the lien ceased to attach to the judgment. The purchaser therefore under such judgment acquired no title with such qualities superadded. But it may be said that when the lien was revived, it related back and gave effect to the purchase by way of affirmance of an imperfect title, as one who sells an imperfect title and subsequently acquires a perfect title affirms the first title. The application of this rule must depend upon the fact as to whether Gray & Bouton by the act of revival acquired a title to the property. We apprehend not. A lien is neither jus in re nor a jus in rem. It conferred no right of property, but a right to sell De Baun’s property. If this was not De Baun’s property, then the lien did not attach to it. If it was, then it must be sold before he can be divested of title to it. No subsequent sale has been made, and of course no valid lien sale can exist in the purchaser. Such are the conclusions at which we have arrived; in the correctness of which, we are sustained by the decisions of other courts, not only with regard to the distinction which we have taken, between the relative position of the debtor and his creditors, and between the creditors themselves; but also with regard to the effect of a sale made between the time of the issuance of the sci. fa. and the revival of the judgment lien. And although these decisions were made in several instances where the statutes were different from ours, yet the general principles apply with full force. In the case of Norton v. Beaver, 5 Ohio Rep. 180, it is said, “When the judgment becomes dormant, the means of enforcing the lien are suspended because they necessai'ily slumber with the judgment, but when the judgment is revived, it is revived with all its incidents. There is no new judgment recovered on the scire facias, but the old one is called into action. The form of execution adopted in practice requires the sheriff to make the money, for want of goods and chattels, from'lands owned by the debtor at the date of the judgment. The statute declares that the sale shall vest as good a title in the purchaser as the debtor' had, whilst the land was liable to satisfaction by the judgment. So far as the debtor is concerned the lien of the revived judgment exists in all its original force. But it does not follow that the rights of others acquired or subsisting under the dormancy of the judgment are subordinate to the revived lien. In a country where land is one of the most familiar and ordinary subjects-of trade, the policy of the law does not favor liens which impose embarrassment on their transfer. The purchaser who acquires title to land, at a time when no lien exists, or at a time when by the creditor’s delay a once existing lien becomes dormant, appears to us to have an equity preferable to him who has indulged in delay. In treating with the debtor he has a right to rely upon the presumption that a dormant judgment is satisfied, The lien of the creditor at this time is indefinite and contingent. It is not a subsisting interest in the lands, but a power to set up an interest that may never be exercised.” The case of Epps & others v. Randolph, 2 Call 103, sustains this opinion. In the case of The Bank of Missouri v. Wills & Bates, 12 Missouri Rep. 364, the question came up under a statute like ours, and under very similar circumstances to those in this case, in which.it was said, “The judgment, reviving the lien of the junior judgment, was not rendered until after the sale of the premises in dispute. The party thus by his own act having disposed of the property on which he wished to impose or continue his lien, it is obvious that the judgment of revival could not relate back and give the purchaser at sheriff’s sale a right which did not exist at the time of the purchase. The party suing out the scire facias to recover the .judgment was under no obligations to continue the proceedings after the sale. He might have discontinued it at his pleasure. The purchaser therefore could not have been influenced in his conduct by any assurance of the revival of the lien. If the sale of the property did not satisfy the judgment, the revival would have had the effect of reviving the lien on the real estate owned by the defendant in the execution, or which he had disposed of whilst subject to it, but surely a creditor could not thereby entitle himself to a lien on. property of the defendant, which bad been disposed of by his own act.” These authorities will sustain the views which we have already expressed. We are next called to consider the claims of Beebe as derived through his purchase from Ringo; in considering which under the rule we have laid down in regard to Beebe’s position as purchaser pendente lite, we will enquire what prior legal or equitable interest Ringo had at the time of Beebe’s purchase. Ringo was called to answer, and says that he held a subsisting debt against De Baun and Thorn, which was one of the partnership debts, from which De Baun agreed with Thorn to save him harmless and absolve him from the payment of, which is the same debt on which judgment was recovered. That he sold the judgment to Beebe, and has no interest in the matter. Beebe is also called to answer, and so far as it is responsive to the issue between the claim of Ringo and Whiting & Slark for priority will be held as in effect part of the defence to the original cause of action, and although Ringo disclaims any present interest, his answer, so far as it tends to sustain the equity of his case, will enure to the benefit of Beebei The interest claimed under this sale arises out of the claim which Thorn has reserved to himself in transferring his undivided half title to De Baun, and in any event only extended to such half interest. Ringo’s equity then must lie derived through Thorn’s equity. In order to establish this it becomes necessary on the part of Ringo or Beebe as his representative to show that the debt sued on was a partnership debt provided for in the transfer, and to predicate the subsequent proceedings upon it. To establish this point, Beebe, in behalf of Ringo, shows a declaration filed on 27th September, 1842, by Ringo against De Baun and Thorn, as partners, trading under the firm name of J. De Baun & Co. The suit was in debt on promissory note executed by the firm on the 29th of March, 1837, due six months after date for the sum of fifteeen hundred dollars with ten per cent, interest from date. Upon which declaration such proceedings were had that on the 23d of June, 1843, judgment was rendered for the plaintiff, Ringo, and thereafter under this judgment a sale was made to Beebe. There is also a note executed by J. De Baun & Co., to Bingo copied into the record, corresponding with that sued upon, but it was not brought there by oyer or otherwise: no notice is taken of it upon the record, therefore, as we have repeatedly held, it is no part o.f the record and consequently was not an exhibit iq tbe cpuse. At this point an issue is raised between Whiting &z Slark and Beebe, who for the purpose of proving that the note sued on was one of the debts embraced in the agreement between Thorn and De.Baun and was the foundation of the judgment exhibited in Beebe’s answer introduced on the trial of the cause the original note (as they allege) upon which Ringo had obtained his judgment; and against the objections of Whiting <Se Slark, the Court permitted Beebe to prove, first, the execution of the note; 2d, that it was marked and filed among the papers ip the case of Ringo v. De Baun & Thorn; and lastly, to read it as evidence in the case; to all of which exceptions were regularly taken and filed at the time. It cannot be said that the original note was an exhibit in the cause. It was produced for the first time by the defendants on the final hearing of the cause. It has been decided, and we think correctly, that unless mad.e an exhibit, viva voce evidence is not admissible to prove its execution. Crist et al. v. Brashier, 3 A. K. Marsh. 170. And even where exhibits are thus proven on the trial the evidence is, in most instances, limited to the mere execution of the instrument. 2 Daniel's Ch. Pl. & Pr. 1,026; or where the instrument comes from the hands of a public officer its custody may be thus proven, b.ut nothing beyond this. And for; this reason it is that the execution of a w ill cannot be proven viva voce, because, besides the mere execution of- the wil^, the sanity of the testator must be established, id. 1,027: and so where aijy additional fact is to be established' in order to, make the exhibit evidence, as in, this case, th.e identifying it a,s the note sued on, the proof is inadmissible. And even when such evidence, offered to prove an, exhibit, is admitted it must be regularly upon application to the Court, and an. order for that purpose or notice to the,adverse party specifying the exhibit intended tp be proven. Parde, v. Deca, 7 Paige 134. Chandler's, Exrs. v. Real, 2 Hen. & Munf. 129. 2 Ban. Pl. & Pr. 1,028. The time given we apprehend, would be rather a matter of discretion with the chancellor. But in this case where the instrument was not an exhibit and where it required not only proof of its execution but also proof to connect it with the judgment, we are satisfied that viva voce testimony was inadmissible. There was no evidence then connecting any subsisting' debt referred to, or embraced in the agreement between Thorn & De Baun, with the judgment under which the sale to Beebe was made, and of course no prior lien existed to that of the judgment itself, which was junior to the claim of Whiting & Slark. Whether the interest of Thorn was a trust or a mortgage interest (and we apprehend it could not extend beyond that) it is very questionable whether it is or not subject to sale under execution, even under the provisions of our statute, which subjects the real estate of the defendant, whether held by patent, or by a third person for his use, of which he was seized either in law or equity, to sale. How far a lien or security may be considered an equitable estate, or what class of equitable estates the legislature designed to embrace (if there is any distinction or reservation to be made) it is not necessary to determine in order to dispose of the rights of the parties in this case, as by our determination of a preliminary point, this question does not necessarily arise, we wall therefore express no opinion with, regard to it further than to remark that in several of our sister States, where these statutes are as broad as ours, such interests, have been held not subject to. sale. In an equitable point of view there can be no- doubt but that the security afforded in a deed of trust or mortgage can only extend, to those debts set forth and recorded in the deed, or perhaps where notice is brought home to the purchaser of the estate thus pledged. The authorities upon this point are clear and conclusive. St. Andrew's Church v. Tompkins, 7 John. Ch. Rep. 16. 4 Kent Com. 176 Day v. Dunham, 2 John. Ch. Rep. 189. Frost v. Bukman, 1 John. Ch. Rep. 229. In the last case Chancellor Kent says, “The- only question with us- is, when, and to what extent, is the registry notice? Is it notice of a mortgage duly registered ? or is it notice beyond the contents of the registry ? The true construction of the act appears to be that the registry is notice of the contents of it, and no more, and that the purchaser is not to be charged with notice of the contents of the mortgage any further than they may be contained in the registry.” And in 4 Kent it is said, “It is necessary that the agreement contained in the record of the lien should, however, give all the requisite information as to the extent and certainty of the contract. So that a junior creditor may, by inspection of the record, and by common prudence and ordinary diligence, ascertain the extent of the incumbrance.” The case in 2 John. Ch. Rep., above cited, is still more in point. The Chancell or, in delivering his opinion said, “All the notice in the case is contained in the schedule to the assignment, stating that the title to the fifty lots is, in the name of the defendant, given as collateral security to pay certain notes.” And in regard to the effect of this as notice, says, “In this case the notice arising from the schedule is lame and defective. There was no notice as to the amount of the notes, or how many, or when payable. The plaintiff in this case might not have inferred from the schedule that the defendant held any thing more than a nominal title, and perhaps as a mere trustee upon some extinguished debt.” These cases go clearly to show that, in order to affect the rights of Whiting & Slark as junior lien, creditors it was necessary to have brought notice home to them, not alone of the existence of the transfer and reservation in favor of creditors, of that, the registry of the conveyance may afford ample constructive notice, but it was necessary to have set forth the identical debt upon which this prior equity is to be founded, so that the junior purchaser might take notice at his peril what he purchased. Such not being the case, upon this ground also the prior equity of Beebe, who holds under Bingo, must fail. In regard to the tax titles, which Beebe also relies upon, as giving him prior equitable and legal right in the contest for this property, it will be perceived that they were acquired after both the original and amended bill had been filed and whilst he was in possession as tenant under the contested titles at issue in the suit, to which he had, by the amended bill, been made a party. Under these circumstances he bought them as outstanding adverse titles, not to sustain the claims of the parties litigant to the matter in dispute, but to assert an independent title superior to theirs. The principle which we have recognized in regard to his position as purchaser pendente lite denies to him all aid from adverse claims for the purpose of strengthening their title or his through them: or, if placed upon the ground of an independent title and properly established and presented, the purchase was for a charge upon the land if unoccupied, or upon the tenant if occupied. Beebe entered under the claims then in litigation and held subject to the final disposition of those cases. In that position his purchase was necessarily in trust and enured to the benefit of the cestui que trust, when the suit should determine who he really was. Burr v. McEwin et al. 1 Baldwin Rep. 162. Taxes are a lien on property which is unoccupied, for which it may be sold. 9 Sergeant & Rawle 112; or, if occupied, the payment is enforced by a distress upon the tenants, 10 Serg. & Rawle 255, and if paid by the tenant it would be a charge upon the rents, and the purchase would enure to the benefit of the true owner of the property under whom he held, which was the very subject of contest in the suit under which he entered. So, when Beebe accounted for rents in his settlement of them with the master, he credited himself with taxes and repairs, and might also have presented the amount of taxes due on the lands for the years for which he had purchased. Upon either of these grounds then, independent of the consideration as to whether these are or not valid tax titles, there can be but little doubt that the defendant acquired no superior equity over the complainants from these purchases. We have now closed our examination of the several claims of the defendants intended to assert a superior equity to that of the complainants. In the investigation of which we have derived much advantage from the research and industry of the counsel on both sides. And if in reference to the several interesting- questions discussed, we have not adverted in this opinion to all of the grounds assumed or by them deemed material, it has not been because they were not duly considered, or the authorities to which reference was made, examined when accessible. It only remains for us now to take a glance at the relative position of the parties and the probable motives which influenced the principal actors, and determine their rights in view of the several conclusions to which we arrived in the progress of our investigation. In the development of the facts, in the outset, of the several transactions out of which the present contest arose, it is by no means improbable that De Baun, in view of the storm of bankruptcy which was thickening around him, was quite willing to take shelter under the judgments of Gray & Bouton and Beach, and shelter his property from the grasp of his other creditors; and for that purpose, and that it might be the more effectual, permitted judgment to be rendered nil dicet for $2,137 89 debt, and interest, when in fact he had previously paid the whole of it except the sum of $996 15. And the acquiescence in this is readily accounted for on the part of Trapnall & Cocke, when we consider the very ample security furnished by their judgment lien on so large an estate. If there had been no understanding upon this subject between the attorney and De Baun, it is scarcely to be presumed that De Baun would have appeared and suffered judgment to go for more than twice what was really due, or that the attorney's would not have entered all proper credits when they took their'judgment. And this conclusion gains much strength from the subsequent conduct of. the parties-. Nearly a year expired before writs issued on either of the judgments and then only in time to save a revival by sci. fa. So we find a release given to Thorn, and, with the full written assent of De Baun, execution is to run for the whole amount of the debt against him-. Why, if Thorn had paid the debt, not enter' credit in full; if only part, for that much or otherwise to the extent of the satisfaction ? A motive at once is found for this in accordance with the previous- conduct of the parties, for it is also shown that upwards of $1,100, on the Beach judgment was paid and yet no credit is entered on the judgment. At this point, defendant Beebe’s position may be defined. It is due to him and it is but fair to presume that at the outset he acted in good faith and bought the property under the trust sale in April, 1843, to save himself from loss as DeBaun’s security and with no wish to wrong any one. After this purchase, he found that there was a probability that he might lose the benefit of his purchase and be defeated in his first object. He, no doubt, bought the Gray & Bouton and Beach judgments from motives and considerations of this kind. This he had a right to do. As a prudent man, looking to his rights and interest, it was perhaps his duty to do so. But when he took shelter under this wide spread cover of DeBaun’s property, and saw that about half of each of those judgments' had been paid, and one of them fully discharged, as to one of the creditors at least, he should have clipped the canvass to honest'dimensions, have credited each of these judgments by what was paid, and openly asserted and pressed his rights to the balance. By this means, the junior lien creditors might, if they chose, have paid off the balance really due, and thereby disencumbered their rights, or have bought with a knowledge of the amount they would be liable to pay, in order' to protect their title to the property so purchased. His failure to do this and his asserting a claim to the whole amount of the two judgments of about $6,000, which had only cost him some $2,400, and when in fact there was only due between $1,300 and $1,400, was in bad faith and oppressive towards the junior lien creditors if not a palpable fraud upon their rights. If the purchase was limited, as stated by Trapnall, to the mortgaged property, it was a direct attack upon the rights of the complainants, theirs being a limited lien, and for that reason more flagrantly unjust. Of this, however, there is no positive proof, as Trapnall’s answer, in this respect, is not responsive to the allegations of the complainant’s bill. Still, all the circumstances tend strongly to show that such was the case. Beebe’s object in making the purchase was to multiply claims upon that particular property; and the subsequent conduct of the parties fully sustains this conclusion; for we see DeBaun, at the sale in May, 1843, acting in concert with Trapnall and Beebe, using his statute rights in directing the sale in such a manner as to defeat the claims of Whiting & Slark. It was also in bad faith to force a sale of this property until the first levy was discharged, and to revive the judgment of Gray & Bouton after it was paid by the sales in November. Beyond this, the struggle on the part of Beebe to protect himself by the purchase of other senior claims, was what might well have been done in good faith. The main points to be considered, in determining, a question of fraud, arc, the act done, the circumstances under which it is done,, and the effect upon the rights of the opposite party. In the case before us, Beebe succeeded to the rights of Gray & Bouton, and whether we consider the act as theirs, or theirs through their agent, is not material. The wrong consisted in the first instance in. causing a second levy to be made before the first was disposed of; in asserting a claim for the whole amount of the judgments, when they knew that there was but a small amount comparatively due; ill concealing from the junior creditors the true amount of their claims; in persisting in selling the property mortgaged, after the other property had sold for a sum sufficient to pay the whole amount really due; and in reviving a judgment which had really been paid, and extending an unjust claim of title over such other estate as might remain unsold — all of which, except the latter act, was clearly to the prejudice of the rights of the complainant; and for which, as well as for the reason that there was no subsisting lien at the time of the purchase by Beebe under the Gray & Bouton judgment, and the several other grounds with regard to the other claims, we are of opinion that the sales and the deeds under which Beebe sets up ■title to the property contained in the complainants’ mortgage ought to be set aside. We are moreover of opinion,, that the complainants have the senior equitable lien on the property in dispute: and that next in order, Beirne & Burnside have the oldqst equitable lien, De fendant Beebe, has, no doubt, acquired a valid legal title to the property under several junior judgment liens and under the statute holds title to the property subject to the prior equitable liens of the complainants, and of Beirne & Burnside, who are entitled to decrees of foreclosure and sale of the property to satisfy their respective claims according to priority in equity: and that defendants Brown and Beebe account to complainants for the rents and profits thereon arising, from the time they respectively entered into possession until the date of such accounting, unless the said Beebe shall elect to pay off and satisfy the prior claims of said Whiting & Slark, and Beirne & Burnside with costs; in which event we see no necessity for holding defendant Beebe to account for rents, but, oh the contrary, he is entitled to the same. Having closed the consideration of the case so far as relates to the issue between complainants and defendant Beebe, we will, before considering the cross-bill of De Baun, consider a collateral issue formed between the complainants and defendant Lawson. And, but for the connexion which the money in dispute has with the title of complainants, which we have decided against them, we would find no very good reason for entertaining the issue or rendering a decree thereon. The complainants have a clear legal right of action against the defendant if their allegations be true; but as equity has taken jurisdiction of the subject matter and the parties, and disposed of one branch of the subject connected with this, and out of which this liability arose, we may proceed to examine into the merits of the case and settle the issue between the parties. The facts abundantly prove that Whiting & Slark, through Fowler, their agent and attorney, paid the defendant, as sheriff, the sum of $903 56, the amount bid for the property in dispute! Lawson, in his answer, admits the receipt of the money, but says that thereafter, on another day, he paid $756 14 of the money back to Fowler, and that he has $243 86 now in his hands, which he was prepared to pay, but that Fowler failed to call for it as he promised. It seems that this and several other sales were set aside by the court, and that other moneys passed at that time between Fowler and the sheriff. Fowler’s deposition is taken, and he states positively that no part of the $903 56 is paid; that the whole amount remains yet,in Lawson’s hands. He says that the $756 draft was paid, but on other and different accounts, and shows as an exhibit, the receipt of Lawson for the payment of several sums, which he states was the money so refunded by the payment of the draft. He states that the draft exceeded the amount of the sums he had paid (except that of $903, which he refused to accept,) by $156, which sum it was agreed between himself and Lawson, should be settled on the same evening' at Lawson’s office; that he attended with the money but Lawson was not there. The receipts, and the positive evidence of Fowler, leave but little doubt of the retention of the money by Lawson, notwithstanding his answer, in which he claims to have repaid part of it. The answer, however, is affirmative in this respect, and he should have made the proof himself to support it. Where an answer admits the receipt of money at one time and sets up that at another tizne, and in another adjustment it was repaid, the repayment is the affirmance of a new act, and must be proved! Deducting the $156 from the purchase money, there would remain in Lawson’s hands $847 56, for which a decree should be rendered in favor of the complainants. It now devolves upon us to consider the merits of the cross-bill of De Baun, the scope of which is to review the acts of the creditors, to set aside the sales made by them of his property, to re-sell the same and to have the proceeds of such sales appropriated according to their equitable right to the same. Pie says that, owing to impending circumstances and the acts of some of his creditors in their contest with each other for priority of right to the proceeds of the sale of his property, a most shameful sacrifice and waste of the property was made, alike prejudicial to the interest of other creditors and to himself, and that their acts he could not control. The Bill is drawn with much care, and the facts arranged with a distinctness and order highly creditable to tbe counsel who prepared the case; nor do the authorities to which he referred, in the main, fall far short of sustaining the grounds of equity upon which the bill rests. They will not avail the complainant any thing however unless he comes before us as an honest debtor, who has surrendered up his property to his creditors and in good faith endeavored, as far as he could, to protect their rights and his own against the effects of a fraud or injury perpetrated by a portion of them to the injury of himself and others. This we think he has not done, but so far from it, we have much reason to suspect that, in the first instance, he not only acquiesced in the very acts of which he now complains, but was an'active agent in producing them. Thus, at the outset he suffers judgment to be rendered in the case of Gray & Bouton for double what was due, took no discharge as to the Beach judgment, but expressly estopped himself from doing so by his written assent to the act, identified himself fully with Beebe and Trapnall in their course at the May term, and at the November term directed the sale of the property which he now says was sacrificed. With what show of equity can he call on the purchasers at that sale to give up the property which they purchased at his direction or otherwise, if made in good faith and without a knowledge of the fraudulent conduct of others? Before he can complain that injustice has been done to his creditors as between themselves, he must do justice to them himself; so far from this, he ran off his whole estate in slaves, although conveyed in trust for the benefit of part of them. When he comes therefore to ask for an equitable account between his creditors, or himself and them, he should at least have come with that property in his hand or tendered an equivalent for it. This he has not done. Under the circumstances of the case the only claims to equity which he may assert must be between himself and Wood-ruff and others, trustees, and that is a matter which may be inquired into apart from any equities in this case. He brings it here only by cross-bill; that bill we think should be dismissed with costs but without prejudice to such rights as he may have as between himself and the trustees. Upon consideration of the whole case, let the decree of the Pulaski Circuit Court be reversed and set aside with costs; and a decree rendered in this court upon the equities of the several parties, upon the following points: First, That the cross-bill of De Baun be dismissed at his costs, but without prejudice to his rights as between himself and others in regard to the deed of trust executed to Woodruff, Watkins and Reardon. Second, That all of the defendants except De Baun, Beebe, Brown and Lawson be discharged with costs. Third, That the complainants’ mortgage be foreclosed, and a decree rendered in their favor for the full amount of their debt in the mortgages set forth with interest thereon from the time the debts became due until the present time, and that defendant Beebe pay the costs in this behalf expended, so far as relates to his own defence, and also all the costs in behalf of all those defendants under whom he sets up title in defence of his claim against the .complainants: and that complainants pay the costs of all other defendants who disclaim an interest, or were not connected with the defence of defendant Beebe. And that the mortgaged property be sold for cash in hand to pay the amount of said decree; the sale to be made at the court-house door in the city of Little Rock, after giving 90 days notice in some newspaper published in said city; the proceeds of sale after paying the expenses of sale to be applied, 1st, to the satisfaction of the decree in this behalf; 2d, the decree of Beirne & Burnside; and lastly, any overplus, after paying each of these demands and costs, to be paid to defendant Beebe. Fourth, A decree in favor of Beirne & Burnside upon their deed of mortgage for the debt therein set forth with the interest from due until the present time, with costs against the defendant Beebe; and that the estate therein mentioned be sold to pay the same upon the like terms (as regards the sale) as above prescribed: and the overplus, after paying the same with costs to be paid to defendant Beebe. Fifth, That the several sales made to defendant Beebe, asserting prior equitable liens upon the property in dispute, be set aside and the deeds and conveyances thereof to him, held for nought. But that holding a valid legal title subject to the prior equitable liens of the complainants, Whiting & Slark and Beirne & Burnside, he may, if he will, elect to pay the amount of their decrees with costs, and retain his title to the estate under such junior judgment liens as he claims to hold, and to afford time for doing so, he is allowed until the first Monday in June next, to make such payment, which when made and the evidences thereof shown to the satisfaction of the Chancellor in court sitting, he shall cause full satisfaction thereof to be entered of record in each of said decrees; and thereupon and in that event said defendant Beebe shall be entitled to all the rents and profits arising from the mortgaged premises from the date of his purchase at the November term, 1843: a decree shall be rendered in his favor according to the practice of said court against his co-defendant Brown. But should said Beebe fail to make such payment and cause such entry of satisfaction to be made within the time prescribed, that Beebe and Brown as tenants be held to account to Whiting & Slark, as mortgagees, for rents and profits, and for the purpose of ascertaining fully what may be due, said Circuit Court in chancery may cause proof to be taken in addition to that already taken, and ascertain the amount due for rents and profits (less taxes and necessary repairs to protect the property from waste or make it tenantable,) and render a decree for the same : and the money arising therefrom when received, shall be applied first, to the payment of the costs against complainants Whiting & Slark; secondly, to the payment of the interest and principal of their debt; thirdly, if an overplus, to the payment of Beirne & Burnsides’ decree, and if enough to pay one, and not both, then the one paid to be entered satisfied, and a sale to be had on the unsatisfied decree for the amount due thereon; or if not enough to satisfy either, then the sale will be made under both decrees, the overplus in any event, after paying both the prior claims and costs to be paid to Beebe. Sixth, That a decree be rendered in this court against defendant Lawson in favor of Whiting & Slark for the sum of eight hundred and forty-seven dollars and fifty-six cents, with costs. And that this decree be certified to the Circuit Court, to be executed according to the several directions herein contained according to equity. Note. — F. W. Trapnall, Esq., having complained, in open court, that unjust and unfounded imputations had been made against him, and his deceased partner, John W. Cocke, Esq., in the foregoing opinion, Mr. Justice WalkeR handed the Reporter the following note: In alluding to the probable motives which may have influenced the parties (attorneys and defendant) in withholding certain credits, which should have been entered on the judgments at law, in favor of Gray & Bouton, and- Beach, against De Baun, I failed to express, as fully as should have been done, the opinion of the Court in regard to that subject. It is due as well to the attorneys as to Mr. De Baun, to say that the omissions referred to, might have been the result of inattention, or of confidence reposed by the defendant in the integrity of the attorneys, or of other cause, not apparent upon the record. It was certainly not the intention of the Court to impugn the motives of the parties, indeed it was wholly immaterial so far as the other creditors of De Baun were concerned, whether the omissions were the result of accident or design. The effect was the same to them. It presented a larger outstanding incumbrance, than was really due, which it was contrary to equity and good conscience, to assert against their junior liens. The Reporter will append this as a note to this opinion.